UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

PAULETTE M. COLLEY

                         Plaintiff,

                                        REPORT AND RECOMMENDATION
                                             06-CV-0749 (LEK)

MICHAEL J. ASTRUE[1]
COMMISSIONER OF SOCIAL SECURITY,

                         Defendant.

## Jurisdiction

1.      This case was referred to this Court by Chief Judge Norman A. Mordue, pursuant

to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3.  This case has

proceeded in accordance with General Order 18 of this Court which sets forth the

procedures to be followed when appealing a denial of Social Security benefits.  Both

parties have filed briefs.  For the reasons discussed below, the Court recommends that

the matter be remanded for further consideration.

## Background

2.      Plaintiff Paulette M. Colley, challenges the Administrative Law Judge's ("ALJ")

determination that she is not entitled to Disability Insurance Benefits ("DIB") under the

Social Security Act ("the Act").  Plaintiff alleges that she was disabled from May 2, 2000,

because of depression, anxiety, bone spurs in her shoulders, status post left shoulder

decompression, left elbow tendonitis, degenerative joint disease, and a thyroid disorder.

---

[1] On February 12, 2007, Michael J. Astrue was sworn in as the Commissioner of the Social Security
Administration.  Pursuant to Federal Rules of Civil Procedure 25(d)(1), he is automatically substituted for
former Commissioner Jo Anne Barnhart as the defendant in this action.

In denying Plaintiff's claim, the ALJ found that during the time period in question, Plaintiff was able to perform her past relevant work (R. at 20).[2]  Plaintiff has met the disability insured status requirements of the Act at all times up until December 31, 2005.

## Procedural History

3.      Plaintiff filed for DIB on March 9, 2004 (R. at 51).  The claim was denied on April 8, 2004.  Id.  Following two hearings, the ALJ issued a decision on April 19, 2005, in which he found that Plaintiff had not met the requirements for disability (R. at 20). Plaintiff's request for review by the Appeals Council was denied on April 19, 2006 (R. at 7A).

4.      On June 15, 2006, Plaintiff filed a Civil Complaint challenging Defendant's final decision and requesting the Court review the decision of the ALJ pursuant to Section 405(g) and 1383(c)(3) of the Act, modify the decision of Defendant and grant DIB to Plaintiff for the period beginning May 2, 2000.[3]  Defendant filed an answer to Plaintiff's complaint on September 25, 2006, requesting the Court to dismiss Plaintiff's complaint. Plaintiff submitted a Memorandum of Law (hereinafter called "Plaintiff's Brief") on November 9, 2006.  On December 21, 2006, Defendant filed a Memorandum of Law in Support of His Motion (hereinafter called "Defendant's Brief") for Judgment on the Pleadings[4] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  After full briefing, the Court deemed oral argument unnecessary and took the motions under advisement.

---

[2] Citations to the underlying Administration are designated as "R."
[3] The ALJ's April 19, 2005, decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's request for review.
[4] Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceedings as if both parties had accompanied their briefs with a motion for judgment on the pleadings…"

# Facts[5]

**Medical Examiners**

5.      On September 14, 1999, Plaintiff met with Dr. Federowicz at Tier Orthopedic

Associates, P.C. (R. at 158).  Plaintiff stated she had hurt her shoulder while working in

July 1999.  Id.  Dr. Federowicz diagnosed "[m]ild impingement of the left shoulder."  Id.

Dr. Federowicz recommended Plaintiff continue with physical therapy and be placed on

an anti-inflammatory medication.  Id.

Plaintiff was back with Dr. Federowicz on October 28, 1999 (R. at 158).  Dr.

Federowicz noted Plaintiff was doing well, had a full range of motion, and found "very

little in terms of impingement maneuvers."  Id.  Dr. Federowicz kept Plaintiff on

Naprosyn.[6]  Id.

On February 11, 2000, Plaintiff saw Dr. Federowicz again (R. at 159).  Dr.

Federowicz noted Plaintiff lacked about ten degrees of forward flexion in her left

shoulder as compared to her right.  Id.  However, her internal and external rotation were

both within normal limits.  Id.  Plaintiff was instructed to continue the Naprosyn, but only

on an intermittent basis.  Id.

Plaintiff met with nurse practitioner, Cathleen Verdon, at United Medical

Associates, on June 9, 2000 (R. at 189).  Plaintiff stated the Celexa[7] was helping her

insomnia and she was better able to concentrate.  Id.  Plaintiff also complained of

depression.  Id.

---

[5] The record contains numerous treatment records that are not relevant to this decision.  As such, they
have been omitted.
[6] Trademark for naproxen. an anti-inflammatory.  *Dorland's Illustrated Medical Dictionary*, 1251 (31st ed.
2007).
[7] Trademark for citalopram hydrobromide, an antidepressant.  *Dorland's* at 317, 372.

Dr. Federowicz reviewed Plaintiff's MRI in February 2001[8] (R. at 154).  Dr. Federowicz diagnosed "[c]ontinued supraspinatus and rotator cuff tendonitis."  Id.  Dr. Federowicz requested approval for arthroscopic decompression.  Id.

Although there are no records of Plaintiff's decompression surgery, it is clear that the surgery occurred.  On October 1, 2001, Plaintiff met with Dr. Federowicz to check the status of her wounds (R. at 155).  Dr. Federowicz found Plaintiff's wounds were clean and dry.  Id. Dr. Federowicz also found that Plaintiff had an "excellent range of motion."  Id.  Plaintiff was instructed to attend "therapy for strengthening and continued exercises."  Id.

Plaintiff saw Dr. Federowicz again on November 8, 2001 (R. at 155).  Dr. Federowicz noted Plaintiff was doing well overall and was progressing well with her range of motion in physical therapy.  Id.  However, Dr. Federowicz did note some weakness.  Id.

On January 8, 2002, Plaintiff met with Helen Harris, Dr. Federowicz's physician's assistant certified ("PAC") (R. at 153).  Ms. Harris found that Plaintiff's mobility and strength were both increasing.  Id.  Ms. Harris found Plaintiff "ha[d] 160 degrees forward elevation, approximately same abduction, internal rotation to T12 and external rotation is about 60 degrees.  She has no residual weakness with resisted external rotation."  Id.  Ms. Harris recommended Plaintiff continue therapy.  Id.

Plaintiff saw Dr. Federowicz again on February 19, 2002 (R. at 153).  Dr. Federowicz noted Plaintiff was doing well and stated "she [was] free to go back to all

_____

[8] The date of the appointment was somewhat illegible, but it appears to have occurred in February 2001 (R. at 154).

activities," but had some "mild restrictions."  Id.  Plaintiff complained of intermittent

aching.  Id.

On April 23, 2002, Plaintiff saw Dr. Federowicz again (R. at 153).  Plaintiff

complained of some occasional aching, but stated the pain was diminishing in both

severity and frequency.  Id.  Dr. Federowicz noted Plaintiff had no work restrictions.  Id.

Plaintiff saw Dr. Federowicz again on July 3, 2002, complaining of aches and

pains in her shoulder (R. at 152).  Dr. Federowicz recommended Plaintiff continue with

an exercise program.  Id.

Dr. Federowicz performed a Loss of Use evaluation for Plaintiff on October 2,

2002 (R. at 152).[9]  Dr. Federowicz found that Plaintiff "has 70 degrees of external

rotation, 70 degrees of internal and 20 degrees of external as noted.  She has lost

motion status post injury and surgery.  She also has some weakness which is hard to

quantify.  At this point using the Workmen's Comp guidelines, [I] feel that the patient has

a 20% Loss of Use to the shoulder."  Id.

Plaintiff met with Dr. Putcha, at United Medical Associates, on December 17,

2002 (R. at 174).  Plaintiff complained of stress and insomnia.  Id.  Dr. Putcha

prescribed Wellbutrin[10] for depression and Ambien[11] for insomnia.  Id.

On January 14, 2003, Plaintiff met with Dr. Putcha again (R. at 173).  Plaintiff's

Synthroid[12] was continued to treat her hypothyroidism.  Id.

---

[9] The record indicates Dr. Federowicz performed this evaluation for the Workers' Compensation Board (R. at 152).
[10] Trademark for bupropion hydrochloride, an antidepressant.  *Dorland's* at 2107, 265.
[11] Trademark for zolpidem tartrate, treats insomnia.  *Dorland's* at 58, 2120.
[12] Trademark for levothyroxine sodium, "used as replacement therapy for hypothyroidism and in the prophylaxis and treatment of goiter and of thyroid carcinoma, . . . ."  *Dorland's* at 1879, 1046.

On January 31, 2003, Plaintiff met with Dr. Putcha requesting to see a psychiatrist (R. at 171).  Dr. Putcha referred Plaintiff to Dr. Duvinsky, a psychologist.  Id.

Plaintiff was back with Dr. Putcha on March 14, 2003 (R. at 170).  Dr. Putcha noted Plaintiff was doing "remarkably well on Wellbutrin."  Id.  Also, since meeting with Dr. Duvinsky, Plaintiff "ha[d] improved in her symptomology remarkably."  Id.

Plaintiff saw Dr. Federowicz again September 2, 2003 (R. at 151).  Plaintiff complained of significant pain in her left elbow since May 2003, although she stated she had experienced some elbow pain since the incident involving her shoulder.  Id.  Dr. Federowicz diagnosed Plaintiff with "[l]eft tennis elbow."  Id.  Plaintiff was given a cortisone injection and instructed to wear a counter force brace.  Id.

Plaintiff's TSH[13] was low, causing Dr. Putcha to lower her Synthroid on October 24, 2003 (R. at 167).

On October 28, 2003, Plaintiff again saw PAC Ms. Harris complaining of left elbow pain (R. at 151A).  Dr. Federowicz refilled Plaintiff's Naprosyn.  Id.

Plaintiff underwent a second injection with Ms. Harris on December 9, 2003 (R. at 151A).

Plaintiff underwent an ultrasound of her thyroid/neck on December 29, 2003, at the request of Dr. Putcha (R. at 196).  Dr. Goldschmidt, the radiologist conducting the exam, found: "[m]ultiple complex cysts.  Multiple nodules, likely colloid cysts, the largest on the left measures up to 3.5 cm."  Id.

---

[13] Thyroid-stimulating hormone.  *Dorland's* at 2001.

On January 30, 2004, Dr. Federowicz noted that there was no further need for injections and Plaintiff would continue with anti-inflammatories (R. at 150).  Dr. Federowicz further noted that Plaintiff would continue to work without restrictions.  Id.

On February 22, 2004, Plaintiff met with Dr. Putcha (R. at 161).  Plaintiff stated that although the Wellbutrin helped initially, she did not feel as though it was controlling her depression as well as it had previously.  Id.  Dr. Putcha opted to continue Plaintiff's Wellbutrin and also prescribed Zoloft.[14]  Id.

On March 26, 2004, Dr. Howland wrote Dr. Putcha a letter concerning Plaintiff's thyroid disorder (R. at 259).  Dr. Howland repeated Plaintiff's complaints of fatigue, trouble swallowing, intermittent hoarseness in her voice, a sense of pressure in her neck, and fullness in her lower anterior neck.  Id.  Based on Plaintiff's medical history, Dr. Howland believed that Plaintiff should meet with Dr. Bartoli "for consideration of surgical excision of the thyroid" (R. at 260).

Plaintiff met with PAC Ms. Harris, at Dr. Federowicz's office, on April 13, 2004 (R. at 246).  Plaintiff requested, and was granted, another injection.  Id.

On August 6, 2004, Plaintiff again met with Ms. Harris (R. at 245).  Plaintiff complained of swelling and tenderness in her left elbow.  Id.  Plaintiff was given another injection.  Id.

On August 16, 2004, Dr. Duvinsky completed a medical assessment of ability to do mental work-related activities (R. at 242-244).  In the making occupational adjustments category, Dr. Duvinsky opined that Plaintiff was generally seriously limited, but had a fair ability to relate to co-workers and a fair ability to use judgment (R. at 242-

---

[14] Trademark for sertraline hydrochloride, a "serotonin reuptake inhibitor."  *Dorland's* at 2120, 1724.

243).  Dr. Duvinsky opined that Plaintiff was generally seriously limited in the making performance adjustments category, but had a fair ability to understand, remember and carry out simple job instructions (R. at 243).  In the making personal-social adjustments category, Dr. Duvinsky opined that Plaintiff generally had a fair ability, with the exception that Plaintiff was seriously limited in her ability to demonstrate reliability (R. at 244).

Plaintiff met with Ms. Harris again on October 1, 2004 (R. at 253).  Ms. Harris stated that while the injections were affording Plaintiff some relief, the effects did not last much longer than a few weeks.  Id.

Plaintiff met with Dr. Federowicz on November 16, 2004 and was given an injection (R. at 252).

Dr. Duvinsky wrote a letter to Plaintiff's attorney on December 21, 2004, concerning his treatment history with Plaintiff (R. at 255).  Dr. Duvinsky stated that ethical considerations would not allow him to disclose his treatment notes.  Id. Instead, Dr. Duvinsky wrote the letter summarizing his history with Plaintiff.  Id.  Plaintiff's first visit with Dr. Duvinsky was on February 20, 2002, and treatment sessions continued every two to three weeks.  Id.  Dr. Duvinsky diagnosed Plaintiff with "[m]ajor depression episode, generalized anxiety disorder, primary insomnia, and chronic pain from a general medical condition."  Id.  Plaintiff was treated with Wellbutrin and Zoloft for her depression and Ambien for her insomnia.  Id.  However, Dr. Duvinsky noted that "her symptoms have remained largely refractory to psychopharmacological interventions." Id.  According to Dr. Duvinsky,

it would not be possible for [Plaintiff] to perform the occupational duties associated with any reasonable form of employment.  Thus I fully support her application for SSD.  I am hopeful that at some point in the future her status may change sufficiently to allow for a return to employment which is one of the goals of treatment.  However, every indication dictates that this may not occur any time soon

(R. at 256).

### Independent Medical Examiners

Plaintiff underwent an orthopedic examination with independent medical examiner ("IME"), Dr. Cusick, on March 30, 2004, at the request of the Social Security Administration ("SSA") (R. at 201).  Dr. Cusick diagnosed: "1. Degenerative joint disease.  2. Depression" (R. at 204).  Dr. Cusick opined that Plaintiff had a fair prognosis for her degenerative arthritis, but a guarded prognosis for her depression.  Id. In his medical source statement ("MSS"), Dr. Cusick stated that "the claimant has moderate-to-marked limitation for repeated or stressful use of the left arm particularly in overhead activity because of the arthritic conditions in the shoulder and elbow."  Id.

That same day, Plaintiff also underwent a psychiatric examination with IME, Dennis Noia, Ph.D., at the request of the SSA (R. at 206).  Dr. Noia diagnosed Plaintiff with Axis I, depressive disorder, not otherwise specified (R. at 209).  In his MSS, Dr. Noia found:

Vocationally, the claimant appears to be capable of following, understanding, and remembering simple instruction and directions.  She appears to be capable of performing simple and some complex tasks with supervision and independently.  She appears to be capable of maintaining attention and concentration for tasks and regularly attending to a routine and maintaining a schedule.  She appears to be capable of learning new tasks.  She appears to be able to relate to and interact appropriately with others.  She appears to be having some difficulty dealing with stress.

> Results of the examination appear to be consistent with depression, and this may occasionally interfere with the claimant's ability to function on a daily basis.

Id. Dr. Noia opined that Plaintiff had a fair prognosis and recommended that Plaintiff continue with her psychiatric and psychological treatment. Id.

**RFC Analysis**

Psychologist M. Morog, Ph.D., completed a mental residual functional capacity ("RFC") assessment on April 9, 2004, at the request of the SSA (R. at 211-213). Dr. Morog found that Plaintiff was generally not significantly limited in the understanding and memory category, with the exception that Plaintiff was moderately limited in her ability to understand and remember detailed instructions (R. at 211). In the sustained concentration and persistence category, Dr. Morog found that Plaintiff was generally not significantly limited with the following exceptions: a) Plaintiff was moderately limited in her ability to carry out detailed instructions; b) Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods; and c) there was no evidence of limitation to determine whether Plaintiff was impaired in her ability to sustain an ordinary routine without special supervision (R. at 211-212). Dr. Morog opined that Plaintiff was not significantly limited in the social interaction category (R. at 212). Finally, Dr. Morog found that Plaintiff was generally not significantly limited in the adaption category with the exception that the she was moderately limited in her ability to set realistic goals or make plans independently of others. Id.

Also on April 9, 2004, Dr. Morog completed a psychiatric review technique (R. at 215). Dr. Morog diagnosed Plaintiff with a depressive disorder, not otherwise specified, and an anxiety disorder (R. at 218, 220). Dr. Morog opined that Plaintiff had a mild

restriction of daily living activities, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and never had repeated episodes of deterioration, each of extended duration (R. at 225).

Disability analyst, J. Heidecker, completed a physical RFC assessment (R. at 229).[15]  J. Heidecker found that Plaintiff could occasionally lift fifty pounds, frequently lift twenty-five pounds, stand and/or walk about six hours in an eight hour workday, sit about six hours in an eight out workday, and had an unlimited ability to push and/or pull, other than as shown for lift and/or carry (R. at 230).  J. Heidecker found that Plaintiff had no postural, manipulative, or visual limitations (R. at 231).  J. Heidecker did not determine whether Plaintiff had any communicative or environmental limitations (R. at 232).

## Discussion

**Legal Standard of Review:**

6.      A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled.  See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will only be reversed if it is not supported by substantial evidence or there has been a legal error. See  Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).  "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.

---

[15] J. Heidecker did not indicate on what date he completed the RFC assessment (R. at 229).

2d 842 (1971).  Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

7.      "To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).  If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]."  Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).  In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review."  Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

8.      The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled as defined under the Social Security Act.  See 20 C.F.R. §§ 404.1520, 416.920.  The United States Supreme Court recognized the validity of this analysis in Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987), and it remains the proper approach for analyzing whether a claimant is disabled.

9.      This five-step process is detailed below:

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled with-out considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

10.     While the claimant has the burden of proof as to the first four steps, the Commissioner has the burden of proof on the fifth and final step.  See Bowen, 482 U.S. at 146 n.5; Ferraris v. Heckler, 728 F.2d 582 (2d Cir. 1984).  The final step of this inquiry is, in turn, divided into two parts.  First, the Commissioner must assess the claimant's job qualifications by considering his physical ability, age, education, and work experience.  Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform.  See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 460, 103 S. Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983).

11.     In this case, the ALJ made the following findings with regard to factual information as well as the five-step process set forth above:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits . . . and is insured for benefits through the date of this decision and until December 31, 2005.
2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
3. The claimant's degenerative joint disease and thyroid disorder are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).
4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.
5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.
6. The claimant retains the residual functional capacity to perform medium exertional work activity which does not require repeated or stressful use of the left arm, particularly in overhead activity.
7. The claimant's past work as a sales associate and bank cashier did not require the performance of work-related activities precluded by her residual functional capacity . . . .
8. The claimant's medically determinable impairments do not prevent the claimant from performing her past relevant work.

(R. at 19-20).  The ALJ also found that Plaintiff's depressive and anxiety disorders "[we]re not severe enough to have caused more than minimal limitations" (R. at 15). Ultimately, the ALJ found that Plaintiff was not under a disability at any time up through the date of his decision.  Id.

**Plaintiff's Allegations**

Plaintiff argues generally that the decision of the ALJ was based on legally error and not supported by substantial evidence.  Specifically, Plaintiff argues that the ALJ erred in 1) discounting the opinions of Plaintiff's treating physicians; 2) finding several of Plaintiff's impairments not severe; and 3) analyzing Plaintiff's RFC.

**Allegation 1: The ALJ Erred in a) Not Granting Controlling Weight to Dr. Duvinsky; b) Not Granting Controlling Weight to Dr. Federowicz; and c) Improperly Relying on the Opinions of the Consultative Examining Doctors**

14

### a) Dr. Duvinsky

12.     Plaintiff's first argument is that the ALJ erred in not granting controlling weight to the psychologist treating Plaintiff's mental impairments, Dr. Duvinsky.  See Plaintiff's Brief, pp. 12-14.

        According to the "treating physician's rule,"[16] the ALJ must give controlling weight to the treating physician's opinion when that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. § 404.1527(d)(2); see also Green-Younger v. Barnhart, 335 F.3d 99, 105 (2d Cir. 2003); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000).  Thus, "[f]ailure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is ground for remand."  Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)).

        Even if a treating physician's opinion is deemed not to be deserving of controlling weight, an ALJ may nonetheless give it "extra weight" under certain circumstances. Under 20 C.F.R. § 404.1527(d)(1)-(6), the ALJ should consider the following factors when determining the proper weight to afford the treating physician's opinion if it is not entitled to controlling weight: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of opinion, (4) consistency, (5) specialization of the treating physician, and (6) other factors that are brought to the attention of the court.  See de Roman, 2003 WL 21511160, at *9

---

[16] "The 'treating physician's rule' is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion." de Roman v. Barnhart, No.03-Civ.0075(RCC)(AJP), 2003 WL 21511160, at *9 (S.D.N.Y. July 2, 2003).

(citing C.F.R. § 404.1527(d)(2)); see also Shaw, 221 F.3d at 134; Clark v. Comm'r of

Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

   Here, the ALJ found that because "the opinions of Dr. Duvinsky are unsupported

by objective medical evidence . . . his opinions are afforded little weight" (R. at 16).  The

ALJ based this decision on Dr. Duvinsky's failure to supply treatment notes.  Id.

However, in exchange for submitting treatment notes, which Dr. Duvinsky stated he had

an ethical objection to supplying, Dr. Duvinsky offered a letter detailing his treatment

history with Plaintiff (R. at 255-256).  This letter, although not as detailed as treatment

notes, supports the MSS he completed.  Dr. Duvinsky also ended his letter by stating

"[p]lease feel free to contact me if you require additional or more detailed information"

(R. at 256).

   Indeed, "the lack of specific clinical findings in the treating physician's report

[does] not, standing by itself, justify the ALJ's failure to credit the physician's opinion."

Clark, 143 F.3d at 118 (citing Schaal, 134 F.3d 496)).  The ALJ has an "affirmative duty

to develop the record and seek additional information from the treating physician, *sua*

*sponte,* even if plaintiff is represented by counsel" to determine upon what information

the treating source was basing his opinions.  Colegrove v. Comm'r of Soc. Sec., 399

F.Supp.2d 185, 196 (W.D.N.Y. 2005) (citing Clark, 143, F.3d at 118; Schaal, 134 F.3d

at 505); See also 20 C.F.R. §§ 404.1212(e)(1), 416.912(e)(1) ("We will seek additional

evidence or clarification from your medical source when the report from your medical

source . . . does not appear to be based on medically acceptable clinical and laboratory

diagnostic techniques.").  Failure to re-contact is error.  See Taylor v. Astrue, No. CV-

07-3469, 2008 WL 2437770, at *3 (E.D.N.Y. June 17, 2008) (finding it error for the ALJ

to not re-contact Plaintiff's treating physician when he determined that the physician's opinion was "not well-supported by objective medical evidence").

Therefore, it was error for the ALJ to grant Dr. Duvinsky's opinions "little weight" without re-contacting him for additional information.  This failure is especially significant given Dr. Duvinsky's apparent willingness to supply the additional information.  Indeed, the Doctor's reluctance to provide information on the basis of his "ethical duty," misguided as it may have been (because his patient may have either expressly or impliedly given consent to the release of information to further her claim), should have been explored by the ALJ and additional information sought.

### b)  Dr. Federowicz

Plaintiff also argues that the ALJ erred in not granting the opinion of Dr. Federowicz controlling weight.  See Plaintiff's Brief, pp. 21-14.  Defendant responds by arguing that Dr. Federowicz's opinions were intended for a Workers' Compensation decision, and as such are not entitled to controlling weight.  See Defendant's Brief, pp. 23-24.

The ALJ failed to grant weight to Dr. Federowicz's opinions, or even to engage in an analysis of weight.  Although Dr. Federowicz did not supply an MSS or RFC assessment, he gave several medical opinions, deserving of a weight analysis, during the course of his treatment of Plaintiff.  See 20 C.F.R. §§ 404.970(a)(2), 416.927(a)(2) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.").  For example, Dr.

17

Federowicz diagnosed Plaintiff with "[m]ild impingement of the left shoulder" on September 14, 1999 (R. at 158), "[c]ontinued supraspinatus and rotator cuff tendonitis" in February 2001 (R. at 154), and "[l]eft tennis elbow" on September 2, 2003 (R. at 151). Dr. Federowicz also offered various medical opinions regarding Plaintiff's restrictions. For example, Dr. Federowicz stated on February 19, 2002, after Plaintiff's decompression surgery, "she [was] free to go back to all activities," but had some "mild restrictions" (R. at 153).

In his analysis of what weight to give a treating physician's opinion concerning the ultimate issue of Plaintiff's disability, the ALJ may consider whether that opinion was directed to the Workers' Compensation.  See Rosado v. Shalala, 868 F.Supp. 471, 473 (E.D.N.Y. 1994) (citing Coria v. Heckler, 750 F.2d 245, 247 (3d Cir. 1984) ("Although plaintiff's doctors had checked off that plaintiff was disabled on forms sent to the Workers' Compensation Board, the standards which regulate workers' compensation relief are different from the requirements which govern the award of disability insurance benefits under the Act.  Accordingly, an opinion rendered for purposes of workers' compensation is not binding on the Secretary."); see also Crow v. Comm'r of Soc. Sec., No., 2004 WL 1689758, at *3 (N.D.N.Y. July 20, 2004) (the ALJ was not required to adopt a treating physician's opinion that Plaintiff was "totally" disabled, in part, because "the opinions were rendered in the context of [Plaintif's] W[orkers'] C[ompensation] claim, which is governed by standards different from the disability standards under the Social Security Act").

However, it does not logically follow that this absolves the ALJ of his duty to assign appropriate weight to Dr. Federowicz's opinions because, after all, he is a

treating physician.  It would be illogical to hold that a treating physician's opinions are not entitled to weight simply because he had provided them in a workers' compensation context.

Therefore, the ALJ erred in failing to assess the appropriate weight to grant Dr. Federowicz's opinions.

### c)  Opinions of Consultative Examining Doctors

Plaintiff argues "that [the] one time examination of Dr. Cusick on the physical impairments and the one time examination of Dr. Noia [on] the mental impairments are not substantial evidence to overcome the opinions of the treating physicians."  Plaintiff's Brief, p. 14.  The Court need not reach a conclusion about this argument because error has already been found with the analysis of both Plaintiff's treating physicians.

Therefore, the Court recommends remand to allow the ALJ an opportunity to re-contact both Plaintiff's treating physicians, Dr. Duvinsky and Dr. Federowicz.

### Allegation 2: The ALJ Erred in Finding Several of Plaintiff's Impairments Not Severe

13.   Plaintiff argues that the ALJ erred in finding Plaintiff's "status post decompression"[17] of the left shoulder, depression anxiety, and left elbow tendonitis not severe.  See Plaintiff's Brief, pp. 10-12.  Because the Court has previously found that the ALJ erred with respect to the treating physician rule, the Court cannot determine whether substantial evidence supports the ALJ's finding that Plaintiff's depression anxiety and left elbow tendonitis were not severe.

However, the Court notes that the ALJ did in fact find Plaintiff's "status post decompression" of the left shoulder severe.  The ALJ found that: "[t]he medical

---

[17] An individual's state after the removal of pressure.  Dorland's at 1793, 1524, 482.

evidence indicates that the claimant is 'status post arthroscopy and decompression' of the left shoulder with degenerative joint disease, and has a thyroid disorder, impairments that are 'severe' within the meaning of the Regulations . . . ." (R. at 15). Although the ALJ later omitted the language "'status post arthroscopy and decompression of the left shoulder,'" and found Plaintiff's "degenerative joint disease and thyroid disorder . . . 'severe,'" it is clear that the ALJ did in fact consider Plaintiff's "status post decompression" of the left shoulder severe (R. at 19).

**Allegation 3: The ALJ Erred in His RFC Finding by a) Not Analyzing Plaintiff's Ability to Do Work on a Regular and Continuing Basis; and b) Failing to Include the Side Effects of Plaintiff's Medications in the RFC**

**a)  Ability to Do Work on a Regular and Continuing Basis**

14.    Plaintiff argues that the ALJ did not evaluate Plaintiff's ability to do work on a regular and continuing basis.  See Plaintiff's Brief, pp. 15-16.

An individual's ability to do work activities must be assessed "on a regular and continuing basis."  20 C.F.R. §§ 404.1545(b), (c); 416.945(b), (c).  Regular and continuing basis is defined as "8 hours a day, for five days a week, or an equivalent work schedule."  SSR 96-8p, 1996 WL 374184, at *1.

Plaintiff appears to be arguing that because of her left arm impairment, she could not use that extremity on a regular and continuing basis.  However, the ALJ appropriately considered this impairment in his RFC, when he found that "[t]he claimant should avoid repeated or stressful use of the left arm, particularly in overhead activity, but has no other postural limitations" (R. at 18).  Thus, the Court can find no error in this aspect of the ALJ's RFC.

20

### b) Fatigue Resulting from Plaintiff's Medications

Although it is somewhat unclear, Plaintiff's final argument in this section appears to be that the ALJ failed to include Plaintiff's subjective claims of fatigue, resulting from her medications, in the RFC analysis.  See Plaintiff's Brief, p. 16.

"An administrative law judge may properly reject claims of severe, disabling pain after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence."  Lewis v. Apfel, 62 F.Supp.2d 648, 651 (N.D.N.Y. 1999) (internal citations omitted).  To this end, the ALJ must follow a two-step process to evaluate Plaintiff's contention of pain, set forth in SSR 96-7p, 1996 WL 374186, at *2:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment (s) . . . that could reasonably be expected to produce the individual's pain or other symptoms . . . .
> Second, . . . the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities . . . .

According to 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii) and 416.929(c)(3)(i)-(vii), if Plaintiff's pain contentions are not supported by objective medical evidence, the ALJ must consider the following factors in order to make a determination of Plaintiff's credibility concerning his pain:

1. [Plaintiff's] daily activities;
2. The location, duration, frequency and intensity of [Plaintiff's] pain or other symptoms;
3. Precipitating and aggravating factors;
4. The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;

5. Treatment, other than medication [Plaintiff] receive[s] or ha[s] received for relief of . . . pain or other symptoms;
6. Any measure [Plaintiff] use[s] or ha[s] used to relieve . . . pain or other symptoms;
7. Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

If the ALJ finds Plaintiff's pain contentions are not credible, he must state his reasons "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." Young v. Astrue, No. 7:05-CV-1027, 2008 WL 4518992, at *11 (N.D.N.Y. Sept. 30, 2008) (quoting Brandon v. Bowen, 666 F.Supp 604, 608 (S.D.N.Y. 1987)).

Because the ALJ found that Plaintiff's "complaints of disabling symptoms and limitations are unsupported by the record," he was obligated to consider the factors set forth in 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii) and 416.929(c)(3)(i)-(vii) (R. at 18), which he did not do. The ALJ failed to discuss why he was discounting Plaintiff's statements concerning the side effects of her medications despite noting earlier in his decision that Plaintiff "testified that the medications . . . she takes for depression and anxiety sometimes make her feel groggy and that she sometimes lays down during the day" (R. at 15).

The Court also notes that the ALJ failed to make the necessary finding at step one of whether Plaintiff's "medically determinable physical or medical impairment (s) . . . could reasonably be expected to produce [her] pain or other symptoms . . . ." 1996 WL 374186, at *2. This is error. See Hogan v. Astrue, 491 F.Supp.2d 347, 352-353 (W.D.N.Y. 2007) (remanding, in part, because the ALJ failed to find whether plaintiff's impairments "could reasonably be expected to produce the pain . . . she alleged"

22

despite noting that the ALJ "carefully review[ed]" the seven factors set forth in 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii) and 416.929(c)(3)(i)-(vii)).

Therefore, on remand, the Court recommends that the ALJ consider the side effects of Plaintiff's medications in his credibility analysis and whether those effects have an impact on Plaintiff's RFC.  The Court also recommends that the ALJ make the necessary findings in the two step process.

Plaintiff also alleges that the ALJ erred by a) not following the RFC of Dr. Duvinsky; b) finding Plaintiff capable of performing her past work; and c) committing various errors at step five of the sequential evaluation.[18]  However, because the ALJ erred with regards to the treating physician rule, the Court cannot reach a conclusion about Plaintiff's arguments.  Thus, on remand, the Court recommends that the ALJ focus on these claims as well.

## Conclusion

Based on the foregoing, it is recommended that Defendant's motion for judgment on the pleadings should be DENIED; Plaintiff's cross motion for judgment on the pleadings should be GRANTED in part and DENIED in part and REMANDED for reconsideration.

---

[18] Although the ALJ found Plaintiff capable of performing her past work at step four, he also continued on to step five of the sequential evaluation to find her capable of performing various light and sedentary positions in the national economy.

Respectfully submitted,

Victor E. Bianchini
United States Magistrate Judge


Syracuse, New York

DATED: April 20, 2009

## ORDER

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby


**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.


**ANY OBJECTIONS** to this Report and Recommendation must be filed with the

Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in

accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of

Civil Procedure and Local Rule 72.3.


**Failure to file objections within the specified time or to request an**

**extension of such time waives the right to appeal the District Court's Order.**

 *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985);   *Small v.*

*Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989);   *Wesolek v.*

*Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.


Victor E. Bianchini
United States Magistrate Judge


Syracuse, New York

DATED:      April 20, 2009